IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| RYAN TOMARKIN, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 07-CV-368-GKF-PJC |
| ) | |
| RELIANCE STANDARD LIFE ) | |
| INSURANCE COMPANY, ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

Plaintiff Ryan Tomarkin brings this suit under the Employee Retirement Income Security Act, 29 U.S.C. §1001, *et seq.* ("ERISA"), seeking judicial review of the decision to discontinue long term total disability benefits under the group disability insurance plan provided by his former employer, DecisionOne Corporation, and issued and administered by defendant, Reliance Standard Life Insurance Company ("Reliance").

**I. Standard of Review**

Reliance, as administrator of the disability plan, had discretion under the plan to determine whether Blackwell qualified for benefits. [AR 18]. Therefore, the court's review is limited to determining if the decision was arbitrary or capricious. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115 (1989); *LaAsmar v. Phelps Dodge Corporation Life, Accidental Death & Dismemberment and Dependent Life Insurance Plan,* 605 F.3d 789, 796 (10th Cir. 2010); *Chambers v. Family Health Plan Corporation,* 100 F.3d 818, 825 (10th Cir. 1996); *Sandoval v. Aetna Life and Casualty Insurance Co.,* 967 F.2d 377, 380 (10th Cir. 1992).

At one time, the Tenth Circuit took the position that where the claim administrator is also

1

the insurer of the plan, an "inherent conflict of interest" exists, and the administrator "bears the burden of proving the reasonableness of its decision pursuant to this court's traditional arbitrary and capricious standard." *Fought v. UNUM Life Ins. Co. Of America,* 379 F.3d 997, 1006 (10th Cir. 2004). However, the Supreme Court rejected such burden-shifting rules in *Metro. Life. Ins. Co. v. Glenn,* 544 U.S. 105, 128 S.Ct. 2343 (2008). The standard for review, after *Glenn*, has been articulated by the Tenth Circuit as follows:

> Following *Glenn,* we now weigh all conflicts of interest–be they standard or inherent–as a factor in our review. *See Holcomb v. Unum Life Ins. Co. Of Am.,* 578 F.3d 1187, 1192-93 (10th Cir. 2009).*Glenn,* 128 S.Ct. at 2351. In our analysis, "any one factor will act as a tiebreaker when the other factors are closely balanced, the degree of closeness necessary depending upon the tiebreaking factor's inherent or case-specific importance." *Glenn,* 128 S.Ct. at 2351. That is, a conflict of interest affects the outcome at the margin, when we waver between affirmance and reversal. A conflict is more important when "circumstances suggest a higher likelihood that it affected the benefits decision," but less so when the conflicted party "has taken active steps to reduce potential bias and to promote accuracy." *Id.*

*Hancock v. Metropolitan Life Insurance Company,* 590 F.3d 1141, 1155 (10th Cir. 2009). Thus, the court must review Reliance's decision to discontinue benefits according to an arbitrary and capricious standard by applying a "combination-of-factors" method of review that allows the court to "tak[e] account of several different, often case-specific, factors, reaching a result by weighing all together." *Holcomb,* 578 F.3d at 1193, quoting *Glenn.* A conflict "should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affect the benefits decision ... [and] should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and promote accuracy...." *Id.*, quoting *Glenn.*

Indicia of arbitrary and capricious decisions include lack of substantial evidence, mistake of law, bad faith, and conflict of interest by the fiduciary. *Hancock,* 590 F.3d at 1155. To

survive the court's review, the insurer's decision "need not be the only logical one nor even the best one. It need only be sufficiently supported by facts within [the insurer's] knowledge to counter a claim that it was arbitrary or capricious. The decision will be upheld unless it is not grounded on any reasonable basis." *Id.*, citing *Finley v. Hewlett-Packard Co. Employee Benefits Org. Income Prot. Plan,* 379 F.3d 1168, 1176 (10th Cir. 2004) (internal quotation marks omitted).

## II. Background/Terms of Policy

Tomarkin was employed as a network analyst for DecisionOne Corporation from March 15, 2000, until he stopped working on August 20, 2001. [AR 2]. He participated in DecisionOne's long-term disability income plan, which was funded by a long-term disability insurance policy, Policy No. LSC 102410 (the "Policy"), issued by Reliance to DecisionOne on July 1, 2000. [AR 9].

Under the Policy's insuring clause, a monthly benefit is paid if a claimant:

(1)  is Totally Disabled as the result of a Sickness or Injury covered by the Policy;
(2)  is under the regular care of a Physician;
(3)  has completed the Elimination Period; and
(4)  submits satisfactory proof of Total Disability.

[AR 22].

"Totally Disabled" and "Total Disability" are defined as:

(1) during the Elimination Period[1] and for the first 24 months for which a Monthly Benefit is payable, an insured cannot perform the substantial and material duties of his/her regular occupation;

   (a) "Partially Disabled" and "Partial Disability" mean that as a result of an Injury or Sickness an Insured is capable of performing the material duties of his/her regular occupation on a part-time basis or some of the material

---

[1] The Elimination Period under the policy is 180 days following the onset of a disability. Benefits are not payable during the Elimination Period.

        duties on a full-time basis. An Insured who is Partially Disabled will be Considered Totally Disabled, except during the Elimination Period;

    (b)    "Residual Disability" means being Partially Disabled during the Elimination Period. Residual Disability will be considered Total Disability; and

(2)    after a Monthly Benefit has been paid for 24 months, an Insured cannot perform the substantial and material duties of any occupation. Any occupation is one that the Insured's education, training or experience will reasonably allow. We consider the Insured Totally Disabled if due to an Injury or Sickness he or she is capable of only performing the material duties on a part-time basis or part of the material duties on a Full-time basis.

[AR 14]. Under the policy:

> Any occupation is one that the Insured's education, training or experience will reasonably allow. We consider the Insured Totally Disabled if due to an Injury or Sickness he or she is capable of only performing the material duties on a part-time basis or part of the material duties on a full-time basis.

[*Id.*]. Under the terms of the Policy, a Monthly Benefit will be paid if an insured:

(1)    is Totally Disabled as the result of a Sickness or Injury covered by this Policy;
(2)    is under the regular care of a Physician;
(3)    has completed the Elimination Period; and
(4)    submits satisfactory proof of Total Disability to us.

[AR 22]. The Monthly Benefit will stop on the earliest of:

(1)    the date the Insured ceases to be Totally Disabled;
(2)    the date the Insured dies;
(3)    the Maximum Duration of Benefits, as shown on the Schedule of Benefits page, has ended; or
(4)    the date the Insured fails to furnish the required proof of Total Disability.

[AR 23].

### III. Plaintiff's Health and Disability Claims History

On June 28, 2001, Tomarkin injured his back in a swimming pool accident. [AR 133,

148].[2]  He stopped working on August 20, 2001, but on June 5, 2002, was allowed by his physician, Christopher L. Place, M.D., to resume working on a part-time basis for four hours per day. [AR 372].  DecisionOne subsequently terminated his employment on November 11, 2002, when he failed to work the doctor-approved four hours per day without an excuse and without notifying his supervisors when he intended to miss work. [AR 265,  311-312, 306-307, 353-354, 418].  Tomarkin submitted a claim for long term disability benefits on May 21, 2002. [AR 218].

Initially, Tomarkin's claim for long term disability benefits was denied. [AR  415-417].[3]

---

[2] According to one of Tomarkin's doctors, Benjamin G. Benner, M.D., Tomarkin had experienced back problems prior to the swimming pool accident as a result of a motor vehicle accident five or six years earlier. [AR 301].

[3] In the denial letter, the administrator stated, "Your occupation as a network analyst is considered by the Dictionary of Occupational Titles to be 'sedentary'.  A sedentary occupation is one in which an employee may need to lift, carry, push, or pull 10 lbs. occasionally, and a negligible amount frequently." [AR 416].  In his appeal letter, Tomarkin challenged this conclusion, stating:

> The duties I was assigned in my current and previous departments included several tasks and projects requiring the setup, operation, and maintenance of workstations and two to eight machine Computer Labs.  This consisted of hardware setup, moving and setup of CPU units and 19" Dell Trinitron Flatscreen monitors (appx. 55 lbs) as well as configuration and software setup.  I am the same pay grade now as I was in my previous department as a 2nd Level Technician.
>
> This position and these duties were not just my job, they were my occupation. While "inexperienced" individuals in my occupation may be considered "sedentary", experienced individuals in my occupation are not required to perform solely "sedentary" work, but also perform similar duties as I have previously described that require lifting, carrying, pushing or pulling or more than 10 lbs of equipment.
>
> My occupation entails working with all aspects of computer systems, from initial setup to maintaining, from configuration to troubleshooting, not just being "sedentary" and having to occasionally move a mouse, or frequently having to move a keyboard.  As a result of my injury, my inability to perform all aspects of my occupation will limit and has limited many things in the progression of my

Plaintiff appealed the decision. [AR at 367-412]. After a Quality Review Summary [AR 361-362], the decision was reversed, and benefits were granted. [AR 363].[4] Tomarkin began receiving benefits on February 16, 2002. [AR 96-97].

After the claim was approved, the insurer periodically requested updated information to evaluate Tomarkin's continuing eligibility for benefits. In April 2003, the insurer asked Tomarkin's pain management specialist, Raymond F. Sorenson, M.D., to complete a Physical Capacities Questionnaire. [AR 220-221]. The doctor's responses, dated May 10, 2003, indicated Tomarkin was capable of performing at a sedentary lift exertional level. [AR 220]. The doctor reported Tomarkin was able to "continuously" perform simple grasping, fine manipulating, and feeling/tactile sensation, and occasionally perform pushing and pulling with both hands. [AR 221]. The doctor did not identify any other factors affecting the patient's physical abilities. [*Id.*]

---

    career.

[AR 368].

    [4]The Quality Review Summary noted the denial letter had omitted to reference the fact that plaintiff had been receiving epidural injections and concluded:

> Based on additional medical documentation, appears claimant continues to experience pain and discomfort. It is also documented that claimant continues to receive treatment consisting of PT and epidural injections. PT note of 5/23/2002 documents that the claimant's progress has been slow.
>
> MRI and physical findings suggest an impairment. As a result, claimant does appear precluded from sedentary work. However, it does appear that claimant's treatment is not very aggressive.
>
> Original decision of denial should be overturned and benefits issued. Recommend pursuing a physiatrist IME given claimant's age and current form of treatment.

[AR 361-362].

Under the terms of the Policy, Tomarkin was entitled to benefits for the first 24 months if he could not perform the substantial and material duties of his occupation. After that period, disability benefits are only payable if the insured is totally disabled from any occupation. In this case, the 24-month change in definition occurred on February 16, 2004. [AR 218].

On March 18, 2004, the insurer asked Tomarkin to complete a supplemental questionnaire and to submit updated medical information. [AR 580]. Tomarkin did not respond to the request and the insurer sent two more identical requests on April 20, 2004, and May 27, 2004, reminding him that it required additional information in order to evaluate his continued eligibility. [AR 578-579]. Tomarkin did not respond to any of the requests.

The insurer, on its own, requested records from Tomarkin's doctors. On June 15, 2004, Gary K. Goforth, D.O., a family practice doctor, submitted an Attending Physician Statement [AR 81-83]. The Attending Physician Statement was dated April 13, 2004. [AR 83]. The insurer also obtained Dr. Goforth's patient records on plaintiff. Included in Dr. Goforth's records was another Attending Physician Statement dated June 15, 2004. [AR 180-181]. The two Attending Physician Statements provide inconsistent responses. In the section titled, "PATIENT CAN LIFT/CARRY:", the April 13, 2004, statement indicated Tomarkin could lift/carry less than 10 pounds occasionally, frequently and continually. [AR 82]. The later form, in contrast, stated Tomarkin could occasionally (up to 2.5 hours/day) lift and carry up to 150 pounds. [AR 180]. In the section titled, "Patient Can Use Upper Extremities For Repetitive Tasks," the earlier form stated Tomarkin could use his left hand, right hand and both hands for simple grasping, could not use them for pushing/pulling, and could use them for fine manipulation. [AR 83]. The later form stated Tomarkin could *not* use his hands for fine manipulation. [AR 181]. The earlier form, in the

section titled, "Patient Is Able To:", indicated Tomarkin could "not at all" climb, balance, stoop, kneel, crouch or crawl; could occasionally reach above his shoulder and finger; and could frequently feel. [AR 83]. The later form stated that Tomarkin could occasionally climb, balance, stoop, kneel, crouch, crawl, reach above his shoulder, handle, finger and feel. [AR 181].

Dr. Sorenson, the pain management specialist, provided medical records spanning a time period of January 15, 2003 through May 5, 2004. [AR 150-161]. The handwriting in these records is largely illegible, but each one rated Tomarkin's pain level on the date of the doctor's visit. [*Id.*] The pain levels ranged from 6/10 to 9/10. [*Id.*]. Generally, Tomarkin's pain level appeared to have decreased during that time period. [*Id.*].

The insurer obtained treatment notes from Pamela Y. Thomas-King, M.D., a pain management specialist Tomarkin saw in Milwaukee on June 30, 2004. Dr. Thomas-King stated that Tomarkin reported his pain was always present and ranged from 6/10 to 10/10. [AR 667]. Her examination revealed range of motion in the bilateral upper extremities within normal limits, bilateral lower extremities negative straight leg raise at 75 degrees, and spine extension and flexion with significant pain and limited mobility. [AR 668-669]. She reported muscle strength and tone of both the bilateral upper extremities and the bilateral lower extremities to be +5/5. [AR at 669].

Clinical Care Management Notes dated July 16, 2004, prepared by Dennis J. O'Brien, a senior clinical specialist for the insurer, state, "The information contained in the file does not clearly support limitations that would affect his ability to perform duties associated with a sedentary or light occupation." [*Id.*]. However, O'Brien recommended a Functional Capacity Exam be performed. [*Id.*].

8

An ErgoScience FCE Physical Work Performance Evaluation ("PWPE") was performed on August 26, 2004, by Don E. Delozier II, PT, MDT. [AR 114-120]. The first line of the PWPE Summary states: "Please note significant self-limiting behavior and testing inconsistencies heavily influenced test results." [AR 114]. Under "Overall Level of Work: Sedentary," the summary stated: "Note that the level of performance was significantly influenced by the client's self-limiting behavior and indicates what he was willing to do rather than his maximum physical abilities." [*Id.*]. Under "Tolerance for the 8-Hour Day" the report stated:

> Based on this evaluation, the client is incapable of sustaining the Sedentary level of work for an 8-hour day. Tolerance for the eight-hour work day was limited by complaints of central and bilateral lumbar pain.

[*Id.*] Under "Self Limiting Behavior," the summary stated:

> **The client self-limited on 72% of the 18 tasks.** Self-limiting behavior means that the client stopped the task before a maximum effort was reached. Possible causes of self-limiting behavior include: 1) Pain, 2) Psychosocial issues such as fear of injury, anxiety, depression and/or 3) Attempts to manipulate test results. Although it is difficult to determine the causes of self-limiting behavior, our research indicates that motivated clients self-limit on no more than 20% of test items. If the self-limiting exceeds 20%, then psychosocial and/or motivational factors are affecting test results. The client's reason(s) for self-limiting behavior were **central and bilateral lumbar pain with dizziness during ladder climb.**

[*Id.*] Under "Testing Inconsistencies," the report noted Tomarkin "[s]cored higher on Climbing Stairs than on Walking." [AR 115]. Under the heading "Task Performance," the report stated: "Due to the self-limiting behavior, we cannot fully determine whether the client's physical abilities match the job demands." [AR 117]. Under the heading, "Results of XRTS Hand Strength Consistency of Effort Testing," the report stated:

> During the X-RTS Hand Strength Consistency of Effort testing, the patient was noted to perform one or more repetitions of the test where 0 pounds of force was generated. Unless there is some obvious physical finding, such as complete paralysis, a force production of zero is indicative of non-compliance. With a

>  force production of zero, it is impossible to perform the numerical calculations that are inherent in the X-RTS protocol that are required to empirically derive the consistency criteria. With a force production of zero it is unlikely that the patient could have performed the other functional activities observed in this assessment.

[AR 120].

On October 5, 2004, the insurer notified Tomarkin it had determined he was not eligible for continued benefits under the plan, and benefits had been terminated effective September 30, 2004. [AR 568-571]. The letter noted that, under the policy, during the first 24 months of coverage, benefits were payable if the insured could not perform "the substantial and material duties of his/her *regular occupation*." [AR 568] (emphasis added). After 24 months, benefits were payable only if "an Insured cannot perform the substantial and material duties of *any occupation*. [AR 569] (emphasis added). The insurer pointed out that it had written Tomarkin to request additional information on March 14, 2004, April 20, 2004, and May 27, 2004, and he had failed to respond to its requests. [AR 571]. The insurer also stated that it had attempted, unsuccessfully, to contact him by telephone on September 15, 2004. [*Id.*] The letter explained a medical review of Tomarkin's file had been completed, and "the information contained in the file does not clearly support limitations that would affect your ability to perform duties associated with a sedentary or light occupation." [AR 570]. The letter stated:

> The MRI performed on October 1, 2001, indicated findings consistent with degenerative changes with possible nerve root impingement. In the latest notes from Dr. Sorenson he noted that your functionality was improving, although it was not clear how much functionality you regained. In addition, there is no indication in the file of adverse effects from any prescribed medications that affect your cognitive or physical functional ability. There is no evidence of any diagnostic testing such as an Electromyogram or Nerve Conduction Study that would clarify the severity of your condition or support the restrictions and limitations provided by your physician. Therefore, in order to clarify your functionality we arranged a Functional Capacities Evaluation for you.

10

[AR 570-571]. The letter reviewed the results of the FCE, concluding, "Due to the self-limiting behavior we were unable to determine your physical capabilities." [AR 571]. The letter stated:

> You have not responded to our requests for information. Furthermore, there is insufficient evidence from your physicians and from the FCE, during which you failed to put forth maximum effort, to support Total Disability from any occupation. Therefore, we have no proof that you are still disabled. Based upon a complete review of the information in your file it is our determination that you no longer satisfy the plan's definition of Total Disability. As such, benefits are terminated effective September 30, 2004.

[*Id.*].

Tomarkin appealed the insurer's decision on February 23, 2005, and submitted additional medical records. [AR 560-566]. He saw Robert Remondino, M.D., with Neuroscience Specialists, P.C., on December 9, 2004. [AR 741-742]. Under "Impression," Dr. Remondino listed degenerative L4-5, L5-S1 disc disease with central L4-5 disc herniation; degenerative T11-12 and T12-L1 discs; "[p]ersistent disabling back pain (90%) and left-leg pain (10%); and, "He does have as somewhat exaggerated pain behavior, as he has almost experienced disabling symptoms when going from sitting to standing to walking." [AR at 741-742]. He ordered a lumbar MRI. [AR 742]. The MRI, performed on December 9, 2004, confirmed degenerative disc disease. [AR 740]. Dr. Remondino stated that he had told Tomarkin "that the best procedure would be a two-level fusion, i.e., L4-5 and L5-S1, probably posteriorly with PLIF and instrumentation." [*Id.*]. However, Tomarkin "would like to avoid that at all costs and is holding his hopes out for the artificial disc, but I am not sure he would be very good candidate for that, in view of the markedly degenerative disc disease." [*Id.*] The doctor noted, "He seems to be in quite a bit of pain, but he is not taking narcotics, so I will leave this between him and his pain management specialist." [*Id.*]

11

At the insurer's request, Timothy G. Pettingell, M.D. performed an independent medical exam ("IME") of Tomarkin on June 13, 2005. [AR 585-591]. Dr. Pettingell's report reviewed the history of Tomarkin's illness. [AR 585-587]. The doctor's physical examination of Tomarkin revealed true lumbar flexion 28 degrees, extension, 14 degrees, right lateral side bending 40 degrees and left lateral side bending 28 degrees. [AR 588]. The doctor noted, "During the examination, when the claimant was sitting on the examination table (an elevated table), the claimant bent forward at the waist to retrieve his sunglasses from the floor. He was able to perform this with no outward sign of pain and his heels were approximately three inches off the floor while in the sitting position." [*Id.*].

Under "Impression," the doctor concluded: "Chronic low back pain with lumbar degenerative disc disease at L4-5 and L5-S1 levels." [AR at 488]. In the "Discussion" section, the doctor stated:

1. Regarding the above stated diagnosis, the prognosis is fair. Specifically, chronic low back pain will persist given the extent of lumbar degenerative disc disease, most notable at the L5-S1 level. Regarding capabilities to improve regarding treatment, although the claimant is reluctant to undergo lumbar spine surgery, lumbar fusion as the option of possibly improving the claimant's current condition. However, lumbar spine fusion surgeries are generally regarded as having a 30% to 40% residua of chronic pain. The outcome long term from lumbar fusion is dependent upon the numbers of levels fused, among other factors. Specific recommendations for treatment at the present time including [*sic*] minimizing narcotic medication and increasing physical activity level with weight reduction. Regarding length of treatment and recovery, the claimant realistically will experience chronic low back pain for many years, if not lifetime. Weight reduction with increasing his physical activity level can improve his overall symptoms in the long term. The claimant has been through extensive physical therapy. The claimant must be proactive in his care and daily exercise and weight reduction are the responsibility of the claimant.

2. The physical capabilities sheet has been completed and is available in the chart. Specifically, in the opinion of this physician, the claimant is not totally disabled from any and all employment. He is capable of performing employment within the guidelines of physical restrictions.

[AR 588-589].

In the Physical Capacities Questionnaire, Dr. Pettingell found that Tomarkin could, on a regular basis for an eight-hour workday, work at a light lift exertional level (exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly). [AR 590]. Dr. Pettingell found that Tomarkin was capable of continuously using both his right and left upper extremities for simple grasping, reaching above mid chest, reaching at waist/desk level, pushing/pulling, fine manipulation and feeling/tactile sensation.[AR 591].

In a letter dated June 28, 2005, the insurer summarized its review of current medical records and the IME performed by Dr. Pettingell. [AR 535-539]. It stated:

> The determination as to whether you satisfy the definition of Total Disability must be based on adequate medical documentation. We have no basis on which to measure subjective complaints or medical opinions that are not substantiated by medical findings. Since the medical evidence does not support your subjective complaints of incapacitating pain and since it has been determined that you would be capable of performing work at least at the sedentary level, you would not be considered totally disabled as defined in the policy.

[AR 538]. Tomarkin's appeal was denied. [AR 539].

## IV. Analysis

Under *Glenn, Hancock* and *Holcomb,* the court must review Reliance Standard's decision to discontinue benefits according to an arbitrary and capricious standard, and applying a "combination-of-factors" method of review. Tomarkin, as the claimant, bore the burden of proving his continuing eligibility. [AR, 18]. *See Hancock,* 590 F.3d at 1156.

The Policy provides that a person is Totally Disabled after 24 months only if he is unable to perform the material duties of any occupation. [AR 14]. The "any occupation" standard is not

demanding. *McKenzie v. General Telephone Co. of California,* 41 F.3d 1310, 1317 (9th Cir. 1994;. *Brigham v. Sun Life of Canada,* 317 F.72, 86 (1st Cir. 2003) (record did not permit finding that a paraplegic suffering serious muscle strain and pain and severely limited in bodily functions was totally disabled; "the hurdle plaintiff had to surmount, establishing his inability to perform any occupation for which he could be trained, was a high one."); *Duhon v. Texaco, Inc.,* 15 F.3d 1302, 1309 (5th Cir. 1994) (finding "any occupation" standard is not demanding even where the insured was an older man with only a high school education).

In this case, the following evidence supports the insurer's decision:

- In a Physical Capacities Questionnaire dated May 10, 2003, Tomarkin's pain management specialist, Dr. Sorenson, concluded Tomarkin was capable of performing at a sedentary lift exertional level. [AR 220-221]. The doctor reported Tomarkin was able to "continuously" perform simple grasping, fine manipulating, and feeling/tactile sensation, and occasionally perform pushing and pulling with both hands. [AR 221].[5]

- Two Attending Physician's Statements completed April 13, 2004, and June 15, 2004, by family practitioner Gary Goforth, D.O., were inconsistent in their assessments of Tomarkin's physical capacity, making it difficult to reach a conclusion about whether Tomarkin was "totally disabled." [AR 81-83, 180-181].

- An FCE requested by the insurer reported self-limiting behavior by Tomarkin and inconsistent performance on the tests compromised the validity of test results. The report stated: "Due to the self-limiting behavior, we cannot fully determine whether the client's physical abilities match the job demands." [AR 117].[6]

---

[5] The Physical Capacities Questionnaire seeks an evaluation of the patient's ability to perform certain activities on a regular basis in an 8-hour workday. The term "continuously" means 67%-100% of the time. [AR 220-221].

[6] Tomarkin contends the FCE confirms his disability status, and the physical therapist indeed noted, "Based on this evaluation, the client is incapable of sustaining the Sedentary level of work for an 8-hour day because of complaints of central and bilateral lumber pain." [AR 114]. However, as previously noted in Section III, the FCE was replete with disclaimers about the validity of test results because of Tomarkin's self-limiting behavior and inconsistent performance. [AR 114-120].

- The IME report and Physical Capacities Questionnaire completed by Dr. Pettingell acknowledged Tomarkin had degenerative disc disease and was likely to experience chronic pain, possibly for his entire life, but stated that plaintiff was nonetheless capable of performing light lift work. [AR 585-591].

Tomarkin argues, however, that the following facts, taken cumulatively, support his claim that he was not given a full and fair review and the outcome of his claim was "predetermined":

- An August 26, 2004, surveillance tape of plaintiff going to a doctor's appointment was lost in the mail. Counsel for Tomarkin states: "This writer can say that in all cases that he has been involved in where surveillance tapes were part of the evidence, that case has settled because these tapes typically support the claimant's claim of disability." [Doc. No. 17, p. 20].

- In e-mail correspondence dated January 23, 2003, Susan Marazza, an employee of Matrix Absence Management, the insurer's claims administrator, stated, "I am always skeptical when claimants complain yet take their time going through with treatment. I'd like to know if the objective findings on the 10/1/01 MRI justify his length of disability and need to transition into full time work. My gut tells me he is malingering...." [AR 434].

- In an e-mail dated September 10, 2002, Mary Granville, a DecisionOne employee, commented, "As you can tell we're trying to do something with him but making sure he can't pull the ADA thing on us." [AR 285].

- A February 6, 2003, Claim Notes Listing by Lisa Howe, an employee of the claims administrator, noted under the heading, "SSDI": "Initial form will be forwarded to social security, most likely need to pursue ssdi." [AR 6]. Under "Direction," the note stated: "At this time update medical information and review with RN, for possible IME for closure or refer to rehab." [*Id.*].

- Dr. Pettingell's IME showed all of the conditions which other doctors found disabled plaintiff but concluded Tomarkin could still perform sedentary work; both the IME and FCE "seem to go out of their ways to discount some of their findings and discredit Mr. Tomarkin." [Doc. No. 20, p. 3].

- The insurer failed to seek input from Tomarkin's family and friends about his physical condition. [Doc. No. 17, p. 21].

This laundry list of alleged irregularities does not, however support a conclusion that the denial of continued disability benefits was arbitrary and capricious. The insurer played no part in

15

the disappearance of the surveillance tape, which was lost in the United States mail when the investigator who made the tape attempted to send it to NWI Investigative Group, Inc. [AR 45]. Similarly, the ADA comment was made by a DecisionOne employee during consideration of Tomarkin's initial claim–not by anyone with the insurer. [AR 285]. The comment by Susan Marazza was made during evaluation of plaintiff's initial disability claim, which was ultimately approved, and long before the review of his eligibility for continued benefits under an "any occupation" standard commenced. Further, the court fails to see anything sinister in the Lisa Howe Claim Notes, which were made while benefits were being paid pursuant to the "own occupation" standard and well before Tomarkin's claim was reevaluated under the "any occupation" standard.

The fact that the insurer obtained an IME does not support Tomarkin's arbitrary and capricious argument. On the contrary, in situations involving a conflict of interest, the Tenth Circuit *encourages* insurers to obtain an IME. *Fought,* 379 F.3d at 1015. There, the court, quoting *Highshue v. AIG Life Ins. Co.,* 135 F.3d 144, 1148 (7th Cir. 1998), stated, "Seeking independent expert advice is evidence of a thorough investigation." *Id.* Moreover, as Tomarkin acknowledges, administrators are not required to accord special deference to the opinions of treating physicians. *Black & Decker Disability Plan v. Nord,* 538 U.S. 822, 831 (2003). Here, the insurer obtained an IME by a specialist and elected to accord his findings more weight than the contradictory conclusions in the two Attending Physician Statements completed by Tomarkin's family physician.

Finally, with respect to the opinions of Tomarkin's family and friends, Tomarkin had a duty (and many opportunities) to submit any additional relevant evidence to the insurer during the

review of his appeal of the discontinuation of benefits. He did not do so. An insurer's decision is not arbitrary and capricious for failing to take into account evidence not before it. *Sandoval v. Aetna Life and Cas. Ins. Co.,* 967 F.2d 377, 380-81 (10th Cir. 1992).

Tomarkin also claims the insurer acted arbitrarily and capriciously because his initial claim for benefits was ultimately granted, and "there is nothing to indicate that Ryan Tomarkin's situation changed any for the better" between the initial granting of benefits and the decision to terminate benefits. The court disagrees. The standard for awarding benefits for the first 24 months of disability was an "own occupation" standard. By plaintiff's own description, his occupation as a network analyst required him to lift, pull and push computer equipment, some of which exceeded 50 pounds, and to do a great deal of kneeling, crawling and bending. The "any occupation" standard covers any sedentary job for which plaintiff was qualified or could reasonably be trained. Moreover, Dr. Sorenson in his May 10, 2003, Physical Capacities Questionnaire responses, determined plaintiff was capable of performing sedentary work [AR 220-221], and Dr. Pettingell, in the IME and accompanying Physical Capacities Questionnaire, determined plaintiff was capable of performing light lift work. [AR 590-591].

Citing *Connors v. Connecticut General Life,* 272 F.3d 127, 136 (2nd Cir. 2001), Tomarkin argues that "in a situation such as this where disability benefits for a particular condition were first granted and then subsequently denied, there is a more difficult burden for the Defendant to overcome." [Doc. No. 17, p. 23]. However, *Connors* does not support such a sweeping conclusion. There, the insurer had paid total disability benefits to a claimant for almost 54 months–including for almost 30 months after the meaning of "totally disabled" changed from the "own occupation" standard to the "any occupation" standard–before it reversed itself and found

17

he was not "totally disabled."  The appellate court held that the "finding of ineligibility was not in response to an application for benefits, but rather a reversal in policy preceded by no significant change in Connors's physical condition," and therefore should have accorded less weight to the insurer's evidence. *Id.* at 136.

This fact situation is clearly distinguishable.  The 24-month "own occupation" period expired on February 16, 2004, and by March 18, 2004, the insurer had requested supplemental information to determine whether plaintiff was still "totally disabled."  Thus, the insurer wasted little time after expiration of the "own occupation"coverage period in investigating whether plaintiff was totally disabled under an "any occupation" standard.  Additionally, by the time the insurer's final decision was made, it had in hand an FCE showing plaintiff had engaged in "self limiting behavior" and opinions from two physicians–Drs. Sorenson and Pettingell–indicating plaintiff was capable of performing at least sedentary work.

Under Tenth Circuit law, the insurer's decision need not be the only logical one nor even the best one.  It need only be supported by facts within the insurer's knowledge to counter a claim that it was arbitrary and capricious.  *Hancock,* 590 F.3d at 1155.  Applying the "combination-of-factors" method of review, the court concludes the insurers decision was neither arbitrary nor capricious.

## V. Conclusion

For the reasons set forth above, the court affirms the defendant's decision denying plaintiff's claim for continued long-term disability benefits.

ENTERED this 23rd day of August, 2010.

*Gregory K. Frizzell*
Gregory K. Frizzell
United States District Judge
Northern District of Oklahoma